Hillsborough, }
May 4, 1926. }

GEORGE I. HASELTON, *Solicitor, v.* INTERSTATE STAGE LINES, INC.

When a statute is fairly susceptible of two constructions, one rendering it constitutional and one not, that construction will ordinarily be adopted which will uphold its constitutionality.

It was not the intention of the legislature by the jitney act as amended (P. L., c. 258) to prohibit the use of the highways of this state to carriers engaged exclusively in interstate commerce, without the prescribed permission and license, nor to regulate such use by imposing thereon any restrictions which would be in conflict with the federal constitution.

Legislative enactments in general and comprehensive terms, prospective in operation, apply to conditions within their general purview and scope coming into existence subsequent to their passage.

As the jitney statute was intended to apply only to operation within the state, the termini at which it is forbidden to receive and discharge passengers are termini within the state, although the ultimate terminus of the vehicle is in another state.

As to those subjects of interstate commerce which require a general or uniform system of regulation, the power of congress is exclusive. In other matters, admitting of diversity of treatment according to the special requirements of local conditions, the states may act within their respective jurisdictions until congress sees fit to act.

When a carrier is engaged in the transportation of passengers for hire between points in different states, and also attempts in connection with such interstate transportation to transport passengers between points entirely in one state, the deprivation of the potential profit which might be derived from conducting intrastate carriage as an incident to the interstate business is not an interference with interstate commerce which infringes the commerce clause of the federal constitution.

INFORMATION IN EQUITY, under Laws 1919, *c.* 86, as amended by Laws 1921, *c.* 59 (see P. L., *c.* 258), to enjoin the defendant from doing intrastate business.

Laws 1919, *c.* 86, provides —

"Sect. 1. Every person, firm or corporation operating any motor vehicle other than a street car upon any public street or way in

the business of transporting passengers for hire, and receiving and discharging passengers along a regular route over which the vehicle is operated, is hereby declared to be a common carrier and as such shall be subject to the provisions of this act so far as applicable thereto.

"Sect. 2. No such person, firm or corporation shall conduct the business defined in section 1 of this act along any portion of a public highway, unless, upon petition and public hearing thereon, the public service commission shall determine that the public good requires that such person, firm or corporation should engage in such business and shall have granted permission therefor. The public service commission, by general or special orders, may establish reasonable rules and regulations relating to the speed and operation of such vehicles and the number of passengers to be carried therein, and otherwise safeguarding the public interest; and every such person, firm or corporation shall comply with such rules and regulations. Any order of the commission granting permission under the provisions of this section shall be conditioned upon the petitioner filing, within thirty days after the date of such order or within such longer time as may be specified in said order, and thereafter keeping in full force and effect a good and sufficient bond in such form and with such sureties as may be approved by the commission, providing for the payment of damages caused to any person or property through any default or negligence in the operation of any such motor vehicles, said bond to be in a penal sum equivalent to five hundred dollars for each motor vehicle to be operated and the additional amount of one hundred dollars for each passenger permitted to be carried therein; and no such motor vehicle shall be operated unless such bond shall have been filed and kept in full force and effect. The bond required by this section shall be deemed to include any policy of insurance or indemnity by which the insuring company shall assume the liability defined by this section; *provided* that such company is authorized to do business in this state.

"Sect. 3. Every city or town within or through which any motor vehicle described in section 1 shall be operated shall have power to make by-laws relating to the licensing of such motor vehicles therein and fixing reasonable license fees therefor; such by-laws to have the same force and effect as by-laws of cities and towns as provided in chapters 40 and 50 of the Public Statutes.

"Sect. 4. Any person, firm or corporation violating any of the provisions of this act shall upon conviction thereof be fined not exceeding one hundred dollars."

This act was amended by Laws 1921, c. 59, by inserting in s. 1, after the words "discharging passengers along" the words "or at the termini of," and by imposing the duty of enforcement upon the county solicitor.

The defendant operates a line of busses running daily over a regular route between termini at Boston, Massachusetts, and Manchester in this state, with intervening stopping places at Lowell, Massachusetts, and Nashua, in this state.

Transferred by *Sawyer*, J., upon the defendant's exception to an order of the court enjoining it from receiving passengers at Manchester for transportation to Nashua, and *vice versa*, until it complies with the foregoing statute.

*George I. Haselton*, county solicitor, for the plaintiff.

*Ivory C. Eaton* and *J. Joseph Hennessy* (of Massachusetts), for the defendant.

SNOW, J. The defendant sets up the unconstitutionality of the amended statute under the commerce clause of the federal constitution, *art.* 1, *s.* 8, and also denies its applicability to the situation here. Each of these issues involves the construction of the statute.

1. It may be conceded that the terms of the act are sufficiently broad to include an order to forbid the defendant's interstate operations except upon compliance with its requirements, and that, if so construed and applied, the defendant would be within the protection of the commerce clause of the federal constitution. It does not, however, necessarily follow therefrom that an intention to exercise such power over the interstate functions of carriers must be imputed to the legislature. Such a construction is neither required by the obvious import of the language employed, nor, as we shall see, is it supported by the evidence. Where a statute is fairly susceptible of two interpretations, one rendering it constitutional and one not, that construction will ordinarily be adopted which will uphold its constitutionality. The presumption is that the legislature intended to keep within the limits of both the federal and the state constitutions, and to restrict the operation of its enactments to cases where they will have effect consistently therewith. *State* v. *Lapoint*, 81 N. H. 227, 228; *Boston Ice Company* v. *Railroad*, 77 N. H. 6, 11, 12; *Kennett's Petition*, 24 N. H. 139, 141; *Opinion of Justices*, 41 N. H. 553, 555; *Leavitt* v. *Lovering*, 64 N. H. 606,

608; *Bliss's Petition*, 63 N. H. 135; *Telephone Company* v. *State*, 63 N. H. 167, 169; *In re Fryeburg Water Company*, 79 N. H. 123, 124; *Grenada County* v. *Brown*, 112 U. S. 261; *Knights Templars' &c.* v. *Jarman*, 187 U. S. 197, 205. This principle of construction has been recently applied to state statutes governing the operation of motor vehicles whose terms were sufficiently general to include interstate as well as intrastate carriers. *Commonwealth* v. *O'Neil*, 233 Mass. 535.

In the interpretation of a statute, the circumstances under which the language is used, the evil to be remedied and the object sought to be accomplished are material evidence. *Opinion of Justices*, 66 N. H. 629, 658; *Mulhall* v. *Company*, 80 N. H. 194, 196, and cases cited. What did the words mean to those who used them? *State* v. *Nadeau*, 81 N. H. 183, 185.

The advent of motor vehicles brought new problems in the regulation of the use of our highways. These problems and their solution have become progressively important as the number of such conveyances and the variety of the uses to which they are put have multiplied, and as their weight and power have increased. Our first attempt at regulation of motor vehicles, Laws 1905, *c.* 86, provided for registration, the licensing of operators and the observance of certain safety regulations, including a limitation of speed. By the same legislative act non-resident cars and operators, registered and licensed in other states, were permitted the use of our highways subject to our speed regulations. In the several amendments and revisions of this law, made during the interim between its enactment and the adoption of the statute now under consideration, no attempt was made to regulate the use of our highways by foreign owned vehicles, except to fix a time limit during which they might be operated under foreign registration and to provide for local registration where the time limit was exceeded. This was the state of the statute law at the date of the legislation in question.

We may fairly take judicial notice that the situation which called for and resulted in the enactment of Laws 1919, *c.* 86, was the advent of the jitney, whose operations were principally confined to transportation of passengers upon the streets of our cities and larger towns. The evident design of the statute was to mitigate the evil resulting from the operation of these conveyances in large numbers by irresponsible proprietors in competition with our street railways and to the danger of both passengers and travelers. Confirmatory evidence of the popular understanding of its purpose is found in

the use of the word "jitney" in the head notes, annotations and indices of the official publication of the laws of that session. The character and the intended scope of the act is disclosed by an examination of the journal of the proceedings of the legislature (see *State* v. *Nadeau, supra*, and cases cited), from which it appears that the first section of the bill as originally proposed read, — "Every person, firm or corporation operating any motor vehicle along and upon any public street or highway for the carriage of passengers for hire and affording a means of local, street or highway transportation similar to that afforded by street railways, by indiscriminately accepting and discharging such persons as may offer themselves for transportation along the course on which such vehicle is operated or may be running is hereby declared to be a common carrier . . . " The redraft of the act by the judiciary committee in the form finally adopted was an apparent attempt to condense the thought expressed in the original draft without material change in meaning. The history of the act in its making thus emphasizes the local character of the traffic with which the legislature undertook to deal. It confirms the conclusions drawn from the language of the statute by this court, within the year following its enactment, in *State* v. *Downes*, 79 N. H. 505, 506, — namely, that the business sought to be regulated was that usually conducted by street railways, which was distinguished by the frequent stopping of its cars upon the streets and highways to receive and discharge passengers. In that case the respondent operated an automobile in the city of Portsmouth in the business of transporting passengers for hire along a fixed route but made no stops to take on or discharge passengers except at its termini. It was held that, as he did not receive and discharge passengers "along" his route, he did not come within the terms of the act. At its next session the legislature amended the act of 1919 by inserting after the words "discharging passengers along" the words "or at the termini of." Laws 1921, *c*. 59. Following so closely upon the announcement of the decision in *State* v. *Downes, supra* (1920), it is a fair inference that the statutory change was prompted thereby and was intended solely to bring cases of a like character within the purview of the act. There is nothing in the amendment, read in the light of this history, indicating a purpose to extend the scope of the statute to interstate traffic. On the other hand the only other provision of the amendment, namely, that imposing the duty of the enforcement of the act upon the county solicitor, tends rather to confirm its local application.

Applying the foregoing principles of construction to the evidence bearing upon the legislative intent, we have to conclude that it was not the intention of the legislature by the amended act to prohibit the use of our highways to carriers engaged exclusively in interstate carriage without the prescribed permission and license, nor to regulate such use by imposing thereon any restrictions which would be in conflict with the federal constitution. Whether the statutes here in question could be construed as intended to include a power to provide for such reasonable regulations of the defendant's purely interstate operations as would not be unduly burdensome thereto (*Hendrick* v. *Maryland*, 235 U. S. 610, 622, 623; *Opinion of Justices*, 81 N. H. 566, 571) is not here presented, and has not been considered. The order undertakes to deal only with the defendant's right to conduct the business of an intrastate carrier. It does not purport to interfere with the defendant's interstate functions, which it has continued to perform without interruption.

2. It is true that companies operating high-powered and capacious busses catering to long-distance transportation had not entered this field in 1921 and could not have been specifically in the legislative mind. It by no means follows, however, that the act does not include their regulation. It is a rule of statutory construction, recognized in this state, that legislative enactments in general and comprehensive terms, prospective in operation, apply alike to persons, subjects and business within their general purview and scope existent at the time of the enactments and to those coming into existence subsequent to their passage. 25 R. C. L. 778; *Rockingham County* v. *Chase*, 75 N. H. 127, 128, 129; *McMillan* v. *Noyes*, 75 N. H. 258, 264; *Bly* v. *Railway*, 67 N. H. 474, 475; *State* v. *Dunklee*, 76 N. H. 439, 441. It seems clear that the language of the statute is sufficiently general to include the intrastate business conducted by the defendant between Nashua and Manchester which the order of court enjoins.

The defendant, however, contends that the statute, being penal in character, must be strictly construed and that, so construed, the language "receiving and discharging passengers along or at the termini of a regular route" does not aptly describe the acts complained of so as to bring the defendant within the definition in s. 1, because one of the termini of its regular route is not within the state and there is no allegation that it receives and discharges passengers along a regular route between Manchester and Nashua. The fallacy of this position is in the assumed construction of the

word "termini" as used in the statute. The intention of the legislature was to limit the operation of the provisions of the statute to the confines of the state. We are therefore concerned only with the termini for its domestic business. As an intrastate carrier the defendant's termini were Manchester and Nashua. This is but a practical application of the legislative intent to the facts of record. It follows that any receiving and discharging of passengers at Manchester or Nashua for intrastate carriage was a receiving and discharging of passengers at the termini of a regular route within the meaning of the act. *Barrows* v. *Farnum's Stage Lines, Inc.* 254 Mass. 240, 245.

There is no merit in the defendant's contention that the statute deals wholly with the physical operation of the vehicles of the carrier and that, therefore, it invades its constitutional right to be in the highway. The statute in terms forbids only the "conduct" of the "business" defined in *s.* 1, namely, "of transporting passengers for hire and receiving and discharging passengers" until the commission has granted permission after a finding that the public good requires that the carrier "should engage in such business." The powers expressly bestowed upon the commission to regulate speed, operation and load disclose the purpose of the legislature to regulate the "business" of the carrier. By "business" is intended that business which the statute forbids without permission. As applied to the facts here it was the business of transporting passengers where the receiving, carriage and discharge were wholly within the state. The practical application of the act by the enjoining order has not interfered with the physical operation of the defendant's busses.

The defendant concedes that it is within the power of the state to regulate the commerce which it may carry on, in so far as the purpose is to secure the safety and convenience of the public, and takes credit for having obeyed Laws 1913, *c.* 187, providing for the registration of foreign corporations, and for having complied with the general motor vehicle statutes requiring the registration of vehicles and the licensing of their operators. It sets up its compliance with these laws as the sum of its obligation to state authority. It cannot be assumed, however, that these statutes have provided for all the reasonable regulations which the state may impose upon intrastate traffic by motor vehicle upon its highways without violating the federal constitution, and that, therefore, there is no field left for the operation of the statute of 1919. On the other hand,

the advent of heavy and high-powered busses running at great speed has introduced new and peculiar elements, affecting the maintenance of the highways and the protection of the public, which necessarily call for regulations of a character quite distinct from those applicable to the operation of private conveyances. The defendant's exception is, of course, predicated upon the recognized fact that Laws 1919, *c.* 86, comprises requirements not included within the statutes to which the defendant has yielded ready compliance. Besides giving to cities and towns, within or through which the carrier's vehicles operate, power by law to license such vehicles and impose fees therefor, and besides authorizing the commission to establish by general or special orders reasonable rules governing the speed, operation and burden of such vehicles, Laws 1919, *c.* 86, permits the commission to grant its permission *only* after a finding that the public good requires that the carrier should ·engage in the business, and *directs* that such authority shall be conditioned upon the carrier's filing and keeping in force an adequate indemnity bond proportioned to the capacity of its vehicles. No claim is made that these requirements are beyond the power of the state when applied to carriers engaged solely in intrastate carriage.

3. The substance of the defendant's principal contention is that, since the operation of its motor vehicles is a movement in interstate commerce between fixed termini in two different states, therefore, the statute cannot be constitutionally applied to its incidental intrastate operations. In other words, it seems to be the defendant's position that, by reason of the fact that it is engaged in interstate carriage, it may conduct intrastate business along the line of its interstate route with the same degree of immunity from state regulation that is guaranteed to it by the commerce clause of the federal constitution in its interstate business. The defendant cites as authority *Buck* v. *Kuykendall,* 267 U. S. 307; *Michigan P. U. Com.* v. *Duke,* 266 U. S. 570, and *Commonwealth* v. *O'Neil,* 233 Mass. 535. The cases do not support the defendant's contention. These were all instances in which the carriers, whose constitutional rights had been violated (or it was so claimed), were engaged exclusively in interstate commerce. In the first named case, the plaintiff *Buck* applied for authority to operate an auto, stage line between Seattle, Washington, and Portland, Oregon, as a carrier for hire to conduct an exclusively interstate passenger and express business. He was denied a certificate on the ground that the territory to be covered

was adequately served by the holders of certificates already issued. The state statute upon which the refusal was based prohibited the use of the highways to common carriers without such a certificate. It had been construed by the highest court of the state to apply to carriers engaged exclusively in interstate commerce. The federal court held that the primary purpose of the statute, as it had been thus construed by the state court, was not regulation with view to safety or to the conservation of the highways (which it was conceded would not have been violative of the commerce clause) but was the prohibition of competition, through the application by state officials of a test which was peculiarly within the province of federal action, namely, — the existence of adequate facilities for conducting such interstate commerce. In other words, the Washington statute, as construed and applied, was held to invade a field reserved to federal authorities by the commerce clause. See *George W. Bush & Sons Co.* v. *Maloy,* 267 U. S. 317.

In the *Duke* case, the Michigan statute prohibited the conduct of the business of transporting persons or property by motor vehicles for hire upon the highways of the state without the permit of the public utilities commission, declaring all persons so engaged to be common carriers and subjecting them to all the requirements imposed upon such carriers. Duke was engaged in interstate commerce as a private carrier moving automobile bodies under contract, operating only between termini at Detroit, Michigan, and Toledo, Ohio. The court held that the statute which laid upon him the onerous duties and strict liability of a common carrier imposed an unreasonable burden upon the kind of interstate business which he was conducting and therefore was in violation of the commerce clause of the constitution.

In the Massachusetts case, O'Neil operated an automobile between Albany, New York, and Pittsfield, Massachusetts, carrying passengers for hire accepted only for the entire trip. An ordinance of the city of Pittsfield prohibited the transportation of persons for hire within the city limits without a license from the mayor and board of aldermen. The state court was inclined to the view that if the ordinance by express terms had been made applicable to interstate commerce, it would, under the circumstances disclosed, have been in conflict with the commerce clause, but held that the ordinance was not intended to apply to a motor vehicle devoted exclusively to the interstate transportation in which the defendant there was engaged. Mr. Chief Justice Rugg who wrote the opinion

has since expressly distinguished that case, as well as the three federal cases above discussed, from a case which in material aspects is not unlike the case here under consideration, and to which we will later refer. *Barrows* v. *Farnum's Stage Lines, Inc.*, 254 Mass. 240, 248.

It is clear that no one of the cited cases, federal or state, gives countenance to the defendant's position that its character as an interstate carrier entitles it to immunity from state control in its proposed intrastate operations.

Moreover, the instant case is clearly distinguishable from the federal cases here relied upon under the principle clearly stated by Mr. Justice Hughes in the *Minnesota Rate Cases* (*Simpson* v. *Shepard*), 230 U. S. 252, 399, 400: "The grant in the constitution of its own force, that is, without action by Congress, established the essential immunity of interstate commercial intercourse from the direct control of the states with respect to those subjects embraced within the grant which are of such a nature as to demand that, if regulated at all, their regulation should be prescribed by a single authority. It has repeatedly been declared by this court that as to those subjects which require a general system or uniformity of regulation the power of Congress is exclusive. In other matters, admitting of diversity of treatment according to the special requirements of local conditions, the states may act within their respective jurisdictions until Congress sees fit to act; and, when Congress does act, the exercise of its authority overrides all conflicting state legislation." This governing principle has been repeatedly stated and reaffirmed. *Cooley* v. *Port Wardens*, 12 How. 299, 317, 319; *Ex parte McNeil*, 13 Wall. 236, 240; *Welton* v. *Missouri*, 91 U. S. 275, 280; *Mobile County* v. *Kimball*, 102 U. S. 691, 697; *Gloucester Ferry Co.* v. *Penn.*, 114 U. S. 196, 204; *Bowman* v. *Chicago & N. W. R. Co.*, 125 U. S. 465, 481; *Port Richmond & B. P. Ferry Co.* v. *Hudson County*, 234 U. S. 317, 332; *Wilmington Transp. Co.* v. *Railroad Com.*, 236 U. S. 151, 154.

In each of the cases relied upon by the defendant, the attempted state action was inherently of a nature which would not admit of regulation by diverse authorities. This is brought out by the court's characterization of the state action in the *Buck* case, namely, "Its primary purpose is . . . prohibition of competition . . . the Washington statute is a regulation, not of the use of its highways, but of interstate commerce. Its effect upon such commerce is not merely to burden but to obstruct it. Such state action is forbidden

by the commerce clause." In other words, the cases relied upon presented instances where the commerce clause, under the principle laid down by Mr. Justice Hughes, was self-executing. See *Cannon Ball Transp. Co.* v. *P. U. Commission*, 113 Oh. St. 565. While reference was made in the *Buck* case to the fact that Congress had acted in aid of highway construction this fact was not deemed vital to the application of the rule. See *George W. Bush & Sons Co.* v. *Maloy, supra.*

On the other hand, without conceding, but assuming that purely intrastate highway carriage for hire by motor vehicles, when conducted by an interstate carrier, may be within the purview of the commerce clause, it cannot be claimed that, in its application thereto, the constitutional provision is self-executing. It is clearly a subject admitting of diversity of treatment, and, in the language of Mr. Justice Hughes, "the states may act until Congress sees fit to act." As there is no claim that Congress has dealt with this subject, it follows that the field is clear for state action.

Substantially the same questions raised by the record here have recently been considered by the Massachusetts state court. *Barrows* v. *Farnum's Stage Lines, supra; Boston & Maine Railroad* v. *Cate*, 254 Mass. 248; *Boston & Maine Railroad* v. *Hart*, 254 Mass. 253; *Commonwealth* v. *Potter*, 254 Mass. 271. All of these cases involved the construction and constitutionality under the commerce clause of a state statute which expressly and unequivocally forbade the operation of any motor vehicle upon any public way for transporting passengers for hire as a business between fixed and regular termini, without first obtaining (1) a license therefor from the city council of a city or the selectmen of a town in which such vehicle is to operate, (2) a certificate from the department of public utilities, and (3) a permit from the division of highways of the department of public works. The actions in the first two named cases were brought after the statute had been amended by the addition of a proviso expressly declaring that such license, certificate or permit should not be required as to carriage or transportation exclusively interstate, while in the other two cases, although the decisions were announced later, the petitions had been filed before the amendment became effective. It is important to note that in the latter cases it was held that the amendment did not affect the conclusions since by interpretation the same meaning must be given to the statute before as after the amendment.

In the *Farnum* case, the defendant was engaged in the operation

of a motor bus line in the carriage of passengers for hire between Boston, Massachusetts, and Providence, Rhode Island, via Worcester, at which latter point its busses made stops to receive and discharge passengers to and from the terminal cities. The route between Boston and Worcester lay wholly within Massachusetts, passing through Newton. The defendant had not obtained license from the city council of the latter city. The court, interpreting the statute, held that the exemption contained in the proviso was confined strictly and solely to those exclusively engaged in interstate carriage and that the statute did not permit one engaged in interstate transportation by motor vehicles of passengers for hire, also to transport for hire passengers the beginning and end of whose carriage is within the commonwealth. As thus construed it was considered that the statute was not violative of the commerce clause. The court said, "The statute here in question requires no license or certificate of those engaged exclusively in interstate commerce for the carriage of passengers for hire by motor vehicle. Such persons are expressly exempted from its provisions. But it requires those engaged in local business to conform to the statutory requirements as to that business. That statute as we have construed it has no direct relation to interstate commerce. It deals exclusively with domestic or local carriage of passengers for hire. This is not a case where the domestic transportation is purely nominal or wholly incidental to the interstate commerce. On the allegations of the bill the two are quite separate and distinct. There is no necessary connection between the two and either could be conducted without reference to the other. . . . It is plain that the statute here in question was designed wholly as a regulation of local and intrastate affairs. It was in existence in some form or other long before interstate carriage of passengers by motor busses was undertaken. It is matter of common knowledge that that kind of interstate commerce is a recent development. It cannot be that one conducting that kind of interstate commerce may, by linking with it purely local, domestic, intrastate commerce, bring the latter under the full protection of interstate commerce and utterly deprive the states of control thereof by the police power."

In the *Cate* case, the defendant was engaged in the daily operation of motor vehicles for the carriage of passengers for hire over the public highways upon a route extending from Brockton through Boston and Lowell, Massachusetts, to Nashua in this state, with fixed routes and stopping places, without the licenses and certificate

required by the statute. The court, confirming the conclusions reached in the *Farnum* case with respect to the interpretation and constitutionality of the statute, said, "The fact that he [defendant] is engaged in interstate commerce and has established a continuous route for his motor vehicles in two states does not enable him to transact any business of transportation wholly within this commonwealth without complying strictly with the sections of the statute as to licenses and certificate."

In the *Hart* case, the defendant, without the required licenses, operated one line of busses between said Boston, Massachusetts, and Keene in this state, and another line between said Boston and Albany, in the state of New York, in each case making stops at intermediate points within the commonwealth, and conducting the business of the carriage of passengers for hire over the public highways. The court, following the *Farnum* and *Cate* cases, sustained an order enjoining such operations. The *Hart* case, however, as we have indicated, differed from the two earlier cases in that the petition in that case had been brought under the statute before the incorporation therein, by amendment, of the express proviso exempting from its operation those engaged exclusively in interstate carriage. The court held that this difference did not affect the result since by the interpretation, without the aid of the proviso, the statute applied only to intrastate commerce and did not include that which was interstate, and that as thus interpreted it was operative as to transportation having its beginning and ending within the commonwealth. The court said, "Even though much the larger part of the business of any person be interstate commerce, yet, if he engages to any extent in local or domestic carriage, requirement for license or permit is a valid regulation respecting such intrastate transactions."

In the *Potter* case, the complaint also antedated the adoption of the proviso. The defendant there was employed as an operator of motor vehicles without licenses, transporting passengers for hire as a business between a fixed and regular terminus in Manchester, this state, and a like terminus in said Boston, stopping regularly for the receiving and discharging of passengers at an intermediate station at Lowell, Massachusetts. The court said that the statute "applies to all who are engaged in local or domestic carriage; and it is of no consequence in this connection whether that local or domestic carriage is exclusive of all other business or is combined with interstate commerce in the same vehicles and by the same instrumentalities. The local transportation wholly within this com-

monwealth is within the exclusive jurisdiction of this sovereignty, and must be conducted in conformity to its laws. Congress has not undertaken to govern such local transportation when combined in the same vehicle with interstate commerce, and questions which then might arise are not presented on this record."

While we have found no federal decision dealing specifically with common carriers by motor vehicles upon the public highways which decides the precise question in issue here, the authorities are numerous which, either directly or indirectly, recognize the power of the state to deal with its internal commerce notwithstanding it may be carried on by a person while engaged in interstate commerce, unless the state action is clearly a burden or restriction upon the latter. Some of these seem especially pertinent. "The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally; but not to those which are completely within a particular state, which do not affect other states, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government. The completely internal commerce of a state, then, may be considered as reserved for the state itself." *Gibbons* v. *Ogden*, 9 Wheat. 1, 195. "Congress . . . has nothing to do with the purely internal commerce of the States, that is to say, with commerce as it is carried on between different parts of the same State, if its operations are confined exclusively to the jurisdiction and territory of that State, and do not affect other Nations or States or the Indian Tribes. This has never been disputed since the case of *Gibbons* v. *Ogden*, 9 Wheat 1." *Lord* v. *Steamship Company*, 102 U. S. 541; *Sands* v. *Manistee River Improvement Company*, 123 U. S. 288, 295; *Monongahela Navigation Company* v. *United States*, 148 U. S. 312, 332, 333. "The rule that the regulation of commerce which is confined exclusively within the jurisdiction and territory of a State, and does not affect other Nations or States or the Indian Tribes, that is to say, the purely internal commerce of a State, belongs exclusively to the State, is as well settled as that the regulation of commerce which does affect other Nations and States or the Indian Tribes, belongs to Congress. Any tax, therefore, which the State may put on messages sent by private parties, and not by the agents of the Government of the United States, from one place to another exclusively within its own jurisdiction, will not be repugnant to the Constitution of the United States." *Western Union Telegraph*

*Company* v. *Texas*, 105 U. S. 460, 466. "Although the jurisdiction of Congress over commerce among the states is full and complete, it is not questioned that it has none over that which is wholly within a state, and therefore none over combinations or agreements so far as they relate to a restraint of such trade or commerce. It does not acquire any jurisdiction over that part of a combination or agreement which relates to commerce wholly within a state, by reason of the fact that the combination also covers and regulates commerce which is interstate." *Addyston Pipe & Steel Co.* v. *United States*, 175 U. S. 211, 247. Where the interstate business of a company was wholly exempt by the state statute it was held that "if the company engage in business within the state of a local nature as distinguished from an interstate or foreign kind of commerce, it becomes subject to the state statute so far only as concerns its local business, notwithstanding it may at the same time engage in interstate or foreign commerce." *Osborne* v. *State of Florida*, 164 U. S. 650, 654. "It has never been held . . . that when the business of the company which is wholly within the state, is but a mere incident to its interstate business, such fact would furnish any obstacle to the valid taxation by the state of the business of the company which is entirely local." *Ib.* 655; *Kehrer* v. *Stewart*, 197 U. S. 60, 68; *Allen* v. *Pullman Car Co.*, 191 U. S. 171, 181. "It is competent for a state to govern its internal commerce, to provide local improvements, to create and regulate local facilities, to adopt protective measures of a reasonable character in the interest of the health, safety, morals and welfare of its people, although interstate commerce may incidentally or indirectly be involved. Our system of government is a practical adjustment by which the national authority as conferred by the Constitution is maintained in its full scope without unnecessary loss of local efficiency. Where the subject is peculiarly one of local concern, and from its nature belongs to the class with which the state appropriately deals in making reasonable provision for local needs, it cannot be regarded as left to the unrestrained will of individuals because Congress has not acted, although it may have such a relation to interstate commerce as to be within the reach of the Federal power." *Minnesota Rate Cases* (*Simpson* v. *Shepard*), *supra*, 402, 403.

It is clear that the order does not directly affect the defendant's interstate business, the performance of which it is permitted to continue without interruption. The defendant's duties as a common carrier do not impose upon it any obligation to conduct an intra-

state business. It may choose between what points it will transport passengers and is free to renounce the carriage of passengers from one point to another within the state. It is not perceived, therefore, in what way the order can operate as an indirect burden or restriction upon its interstate business. The deprivation of the potential profit which might be derived from conducting intrastate carriage as an incident to the defendant's interstate business is not an interference with interstate commerce which infringes the commerce clause. *Barrows* v. *Farnum's Stage Lines*, 254 Mass. 240, 247; *Minnesota Rate Cases* (*Simpson* v. *Shepard*), *supra*, 410, 411; *Missouri P. R. Co.* v. *Larabee Flour Mills Co.*, 211 U. S. 612, 621; *Covington & Cincinnati Bridge Co.* v. *Kentucky*, 154 U. S. 204, 209, 210; *DeRochemont* v. *Railroad*, 75 N. H. 158, 160, 161; *Cavanaugh* v. *Railway*, 75 N. H. 243, 245.

As the subject matter of the order is not one with respect to which the commerce clause is self-executing, or one with reference to which Congress has seen fit to act, and as the order does not unduly burden or restrict the defendant's interstate operations, it follows that the order does not violate its constitutional rights.

*Exception overruled.*

All concurred.